IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CLARA J. USHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 12-3274 |
| | ) | |
| HORACE MANN SERVICE | ) | |
| CORPORATION, JASON SHRUM, | ) | |
| and MELINDA LAWSON, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Horace Mann's Motion for Summary Judgment is Allowed.

Plaintiff Clara J. Ushman filed a Complaint alleging that Defendants

violated her rights under the Family Medical Leave Act, 29 U.S.C. § 2601

et seq. ("FMLA").  Her employer, Horace Mann Service Corporation, was

covered under the FMLA, and Plaintiff was entitled to leave under the

FMLA.

Defendants Horace Mann Service Corporation, Jason Shrum and

Melinda Lawson deny that they violated any of the Plaintiff's rights and

assert that she was terminated for cause based on egregious and unexplained errors found in her work product.

## I. FACTS

### A. Plaintiff's background at Horace Mann

Plaintiff Clara Ushman began working at Horace Mann in August of 2010. She first worked as an accounts payable assistant. As an accounts payable assistant, the Plaintiff worked under the supervision of Rick Harvill until January of 2012.

In January of 2012, the Plaintiff became a billing account technician. A billing account technician is responsible for processing payments received from schools. The Plaintiff was responsible for processing payments of annuity, life, and auto insurance for participants in her assigned states. One of the states assigned to the Plaintiff was Delaware. The Plaintiff had other states as well, including California. The Plaintiff's direct supervisor as a billing account technician was Jason Shrum, one of the Defendants. Melinda Lawson, another Defendant, was and is Jason Shrum's supervisor. The Plaintiff had very little contact with Ms. Lawson. The Plaintiff recalls

speaking with her only once regarding the processing of an outgoing payment and never spoke with Ms. Lawson again.

The Plaintiff understood her duties to include checking the database of each state she was assigned every day to see whether or not a check had been received. The Plaintiff would then review the master list of all the participants and the amounts of money to be applied for each participant. She understood that her job was to enter into the computer the correct amounts of money submitted by the client for each participant identified.

When new participants were identified on the master list, the Plaintiff understood that she was to add them as a participant if they did not already have an established account. In order to add a new participant, the Plaintiff would have to take extra steps to check the database to make sure that the person on the right hand side was not mistakenly included with the information she received. This process may require her to check the mainframe database. She could search by name or by social security number to see what existing policy may already be in place and to verify personal information of a participant, including the school employing them.

If there were a significant number of extra participants who had to be added to the bill, that would take extra time because she would have to look up their particular policies. If there were not many discrepancies between the master list and the new one, payments could go rather quickly. However if not, it could take quite a bit of time.

The Plaintiff received her first assignment in March of 2012. The payments on the Delaware account usually came in every other Friday around 3:00 p.m. or later. The Plaintiff did not make any complaints to Horace Mann about having to stay over to finish the Delaware account.

It is likely the Plaintiff was notified of the audit around August 2, 2012. Cyndy Crain informed the Plaintiff by email that an audit was conducted. Ms. Crain advised the Plaintiff that she wanted to meet with her concerning the Delaware account. The Plaintiff met with Ms. Crain and her assistant, Cathy. At the time, the Plaintiff was shown a master list on her computer of the Delaware payment and was told they had found various mistakes relating to the account. The Plaintiff recalls Cathy identifying individual names and amounts that were different from what

the master list had shown and asking her to explain why the amounts were different. The Plaintiff responded that she could not provide an answer without seeing the list that had been sent from the school. The Plaintiff knew that Horace Mann believed there were errors with the Delaware account at the time of this meeting. She was aware from Cathy's statements that the amounts associated with the participants did not match up with the master list. Before this meeting, the Plaintiff had never met or seen Ms. Crain or Cathy. The Plaintiff is aware that they worked in the internal audit department of Horace Mann.

After her meeting with Ms. Crain and Cathy, the Plaintiff spoke with Jason Shrum. The conversation took place at his desk. The Plaintiff states she informed Mr. Shrum of the previous meeting and the reported discrepancies with the Delaware payment. Mr. Shrum was not aware of these discrepancies until the Plaintiff advised him.

The next day, on August 3, 2012, the Plaintiff received an email from Ms. Crain and Cathy. The email included an attached list. Although the email requested that the Plaintiff review the documents, the Plaintiff did

not open the attachment. The Plaintiff forwarded the information to Mr. Shrum without reading it but believes the information contained a copy of what Cathy had shown her the day before. However, the Plaintiff could not verify what the attachment contained because she did not open it.

The Plaintiff claims she is not familiar with the exact errors that were made relating to the Delaware account. On August 16, 2012, the Plaintiff was told she was being terminated for being an unfit processor. The Plaintiff acknowledges that Melinda Lawson contacted her after her termination and explained to her that her termination resulted from discrepancies in the Delaware account which cost the company money in back pricing. Ms. Lawson told her it was going to take a long time for those errors to be corrected and reassigned.

B. Plaintiff's medical issues

Several weeks before she was terminated, on June 21, 2012, the Plaintiff advised Jason Shrum, her supervisor, that she was speaking with Deona Kuntzman about her upcoming need for back surgery. The Plaintiff had previously mentioned to Mr. Shrum that she had problems with her

back. She also had stated prior to June 21, 2012, that she knew she would be needing surgery in the future.

Rick Harvill, the Plaintiff's boss prior to Jason Shrum, also was aware that Plaintiff had problems with her back. The Plaintiff had back surgery in August of 2011, while employed at Horace Mann. The Plaintiff states Mr. Harvill was aware of her back surgery in August of 2011. He accommodated the Plaintiff's request to wear tennis shoes at work following the surgery.

The Plaintiff has had problems with her back for over fifteen years. Although she did not have physical restrictions placed on her permanently when she returned to work, the Plaintiff did have some lifting restrictions during her recovery period. The Plaintiff's job at Horace Mann did not require significant lifting or bending.

After her 2011 surgery, the Plaintiff continued to have pain. The Plaintiff does not recall complaining to anyone at Horace Mann about having problems with her back following the surgery. She did not request other accommodations relating to her back except to wear tennis shoes.

When the Plaintiff started her new position, she asked Mr. Shrum for a better chair for her back. Mr. Shrum accommodated that request. The Plaintiff did not ask for anything else as it related to her back.

On or about June 21, 2012, the Plaintiff met with Deona Kuntzman to obtain information about FMLA leave. At the time, her next back surgery was not scheduled. The Plaintiff was provided with the information she requested from Ms. Kuntzman.

The Plaintiff claims she advised Jason Shrum on July 5, 2012 that she was going to have back surgery. She did not specify the date of the operation procedure because her doctor had not yet set the date. Horace Mann was aware that Plaintiff would likely need another surgery by June 21, 2012, or at least by July 5, 2012.

Prior to August 16, 2012, the Plaintiff had not been treated negatively by her supervisors. The Plaintiff did not find out her actual surgery date of September 11, 2012, until August 15, 2012. Due to the timing of the events, the Plaintiff believes her termination was related to her request for surgery.

## C. Plaintiff's termination from Horace Mann

The Plaintiff claims that when she met with Jason Shrum and Melinda Lawson on Thursday August 16, 2012, she asked Mr. Shrum if he had received her text message and he responded that he had. Ms. Lawson was present in the conference room and the Plaintiff asked if she was aware of the text message. Ms. Lawson responded that she was not aware of the text message. The only communication the Plaintiff had with her supervisors regarding the exact surgery date was a text message to Mr. Shrum.

Following her termination, the Plaintiff had a conversation with Deona Kuntzman on August 27, 2012, because she had questions concerning paperwork. The Plaintiff states she asked Ms. Kuntzman her personal opinion as to whether or not her surgery was a factor in her termination. According to the Plaintiff, Ms. Kuntzman replied that although the timing seems suspicious, she was not aware that surgery was a factor. The Plaintiff has not had any conversations with Ms. Kuntzman since August 27, 2012. The Plaintiff has no information suggesting Ms.

Kuntzman was personally involved in her termination.

According to the Plaintiff, Justin Miller was a comparable employee as it relates to his dates of employment and his job assignments at the company while the Plaintiff was employed there. The Plaintiff has had no personal knowledge of other persons at Horace Mann who made a similar number of errors with respect to accounts with the same job title at Horace Mann. The Plaintiff has no personal knowledge regarding the errors, if any, made by Justin Miller with respect to his job. The Defendants allege that Mr. Miller was not a comparable employee at the time he made any errors. Mr. Miller did not have the same supervisor at the time and neither Mr. Shrum nor Ms. Lawson was aware of the errors. The Defendants claim that Mr. Miller's job duties were not similar to the Plaintiff's.

Horace Mann advised the Plaintiff that she was terminated for reasons relating to the many errors associated with the Delaware account assigned to her. She was an at-will employee at the time of her termination. Horace Mann is of the position that the nature of the errors made by the Plaintiff suggested to them that she entered data to balance the totals on

the account without making efforts to confirm that the amounts received for each participant were being applied in the specified amounts to the individual participants identified from the schools in Delaware. Due to the nature of these errors, the number of the errors and the inadequate reason provided by the Plaintiff as to why the errors occurred, Horace Mann terminated the Plaintiff.

Jason Shrum and Melinda Lawson met with the Plaintiff on August 16, 2012, following Horace Mann's quarterly audit on the Delaware account. Mr. Shrum believes that the type of errors made by the Plaintiff were blatant. According to Mr. Shrum, the Plaintiff acknowledged that she made the errors because she did not want to work overtime. Jason Shrum was made aware that there were issues concerning errors with the Delaware account roughly a week or so prior to August 15, 2012. Before then, Mr. Shrum was not aware of the specific type of errors made by the Plaintiff.

Jason Shrum testified there were a total of eight errors. Essentially, money which was billed and came in was applied to the wrong entity. In order to properly process payments from a client such as Delaware, the

computer system requires the total amounts to balance before it would show the pay completed for further processing. Mr. Shrum understood the Plaintiff's errors to be of the sort that appeared instead of applying $500 to a new participant, she was applying $500 in broken up amounts to three or four other participants or she would give $500 to an existing, different participant, which was an easier process. This resulted in the person's retirement money not being applied as it was sent in. The information regarding the errors was provided to the Plaintiff by Karen Devlin, who is part of the consultant team.

Jason Shrum prepared a termination document dated August 16, 2012. Mr. Shrum was aware that Plaintiff may need surgery at the time he interviewed her for the position in his department in August of 2011. The Defendants allege that Plaintiff's application for FMLA leave was not discussed by those recommending the Plaintiff's termination. Mr. Shrum testified that throughout the Plaintiff's employment, he never talked to anyone about her FMLA. Melinda Lawson also testified she did not find out about the Plaintiff's FMLA request until weeks after she was

terminated.  Mr. Shrum could not say whether Mr. Duffin and Ms. Gesell, high ranking officials who met to consider the Plaintiff's termination, were aware that she had made an FMLA request.

The Plaintiff's trainer, Patty Wiggers, informed the Plaintiff that her surgery would have to wait until November because of workload in the Fall to which Mr. Shrum remarked two days prior to the Plaintiff's termination, "Umm . . .  not sure that's Patty's decision."

According to Mr. Shrum, he was not presented the findings from the audit until close to 5:00 p.m. on August 15, 2012.  The documents referencing the errors made by the Plaintiff begin at page 3067, 3115, 3184, 3239, 3300, 3345, 3407, and 3472.  These numbers reference the beginning pages of each error identified in the eight individual pays.

Melinda Lawson was present for the Plaintiff's termination meeting. Ms. Lawson testified that she heard the Plaintiff say that the errors identified to her were made because Delaware comes at the end of the day and she did not want to stay.  The Plaintiff denies making that statement and states that Ms. Lawson's testimony lacks credibility.

Jason Shrum made the decision to terminate the Plaintiff. Melinda Lawson supported the decision. Mr. Shrum testified that the decision to terminate the Plaintiff was not made until the Plaintiff allegedly said she purposely made the errors because she did not want to stay and work overtime. The Plaintiff denies making that statement. There were no discussions concerning any potential workers' compensation claims by the Plaintiff during these meetings.

D. Errors with the Delaware account

According to Horace Mann, the Plaintiff had to have forced a balance by purposely applying incorrect amounts in order to balance the statements so the pays would continue to process. Melinda Lawson testified that although certain types of errors might be described as common, such as transposing numbers, the type of error made by the Plaintiff in this case was not similar to anything Horace Mann had seen before.

Melinda Lawson is currently the supervisor of Jason Shrum at Horace Mann. She was also Mr. Shrum's supervisor in August of 2012, at which time he was the supervisor for the Plaintiff. Ms. Lawson stated that the

information regarding errors committed by the Plaintiff became known to Horace Mann following communication from a contact for the Delaware account advising that there were discrepancies in the amounts being provided to Horace Mann as compared to what was being posted to their accounts. At the time, Horace Mann conducted quarterly audits pursuant to its contract with Delaware. These quarterly audits involved a check only of the total balances of each pay received from client Delaware as compared with the balances Horace Mann posted. The regular quarterly audits conducted by Horace Mann did not include a check of amounts posted to each individual participant. Because of the manner in which the audits were conducted, the Plaintiff's errors were not identified as a result of the standard quarterly audit conducted by Horace Mann.

Subsequently, a more thorough audit was conducted comparing the amounts of each participant rather than just the total amounts received from Delaware. The audit revealed that although the total amounts for the Delaware account matched with the total amounts that Horace Mann paid, the amounts for each participant were not being appropriately applied in

many instances.  Ms. Lawson stated that the discrepancies or errors in the Delaware account were attributed to the Plaintiff.  When amounts were entered on this account, the person entering them had to access the computer using an identification number.  Ms. Lawson stated that with one exception, the identification number used to enter the amounts found to be in error was the number assigned to the Plaintiff.  The one other error was attributed to Justin Miller.  The Defendants claim Mr. Miller's mistake was not similar to the Plaintiff's errors.

There were about a thousand policyholders that Plaintiff processed for Delaware.  In order for the person entering the amounts to have the pay processed, the total dollar amounts at the bottom of each screen had to be equal from Delaware as compared to the screen for Horace Mann.  The pay screens where errors were made by the Plaintiff reflected equal totals for what Horace Mann entered and what Delaware sent.  Ms. Lawson stated that the amounts entered for each participant was inaccurate, but somehow when added together totaled the same as the other screen.  According to Ms. Lawson, for this to occur once would be an amazing coincidence.  For

it to occur eight times suggested purposeful manipulation of the amounts being entered.

The Plaintiff alleges she still does not know the nature of her alleged errors.  Moreover, the Plaintiff provided the same explanation of the discrepancies to Mr. Shrum and Ms. Lawson that she had earlier given to Ms. Crane.  The Plaintiff stated that Mr. Shrum did not physically show her what he was looking at and she did not have the master list in front of her to compare any discrepancies.

At the August 16, 2012 meeting with Melinda Lawson, the Plaintiff did not deny that Delaware was her account.  Subsequent to the Plaintiff's termination, a 100 percent audit of all her clients was conducted.  Ms. Lawson stated that the audit revealed similar errors with other clients.  All of these errors had to be identified and corrected.

The Defendants can point to no similar instance where an employee was terminated.  According to the Defendants, this is because no other employee had ever been found to make the type of egregious errors made by the Plaintiff.

## II. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the Plaintiff. See Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. See Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. See id.

### B. FMLA retaliation

(1)

The Plaintiff contends that Defendant terminated her employment in retaliation for her requesting FMLA leave. The Plaintiff proceeds only under the direct method. To avoid summary judgment under the direct method, a plaintiff must provide evidence that (1) she engaged in activity protected by the FMLA; (2) her employer took an adverse employment action against her; and (3) there was a causal connection between the two events. See Pagel v. TIN Inc., 695 F.3d 622, 631 (7th Cir. 2012). Because the Plaintiff is able to meet the first two elements, the Court's focus turns to the causal link.

A plaintiff may meet her burden on the third element via a direct admission from the decision-maker or through a "convincing mosaic of circumstantial evidence" from which the inference may be drawn. See id. "The convincing mosaic of circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." Id. On summary judgment, this circumstantial evidence must point "directly to the

the conclusion that an employer was illegally motivated, without reliance on speculation." Good v. Univ. of Chi. Med. Ctr., 673 F.3d 670, 676 (7th Cir. 2012). Although the Plaintiff does not point to any direct evidence, she claims she has presented each type of circumstantial evidence.

The Plaintiff contends that nothing in the Defendants' records supports the assertion that a mistake–particularly an egregious mistake-- was actually made by her. The Plaintiff alleges she provided the same explanation to everyone she talked to about the alleged discrepancies. Although Jason Shrum testified that he had a hard copy of the master list and the school list and the bills, the Plaintiff was not shown the documents used to explain her alleged errors at her termination meeting. The Plaintiff claims she was not shown the lists and billings or her initials and employee identification number on the alleged errors. She emphasizes that another employee, Justin Miller–who the Plaintiff alleges had a record for intentional misconduct at the company–made a mistake on the Delaware account.

The Plaintiff further alleges she had a record of accuracy and a history

of positive performance reviews. Over the course of her employment, the Plaintiff's work product was consistent with Horace Mann's 98 percent standard. The Plaintiff further contends there is nothing in her termination memorandum suggesting that Plaintiff altered or falsified company documents, in violation of the company's handbook.

At first glance, the timing of the Plaintiff's notification to her supervisor of the scheduled date of her surgery and her termination appears to be suspicious. On August 14, 2012, the Plaintiff emailed Jason Shrum stating another employee had informed her that her surgery would have to wait until November because of the work load in the Fall. The Plaintiff told Mr. Shrum she would not be able to wait that long. Although the Defendants had known for some time that Plaintiff experienced back problems and also knew for approximately two months that she would need surgery, it was on August 15, 2012 the Plaintiff informed Jason Shrum that her actual surgical date would be on September 11, 2012.

It was the following morning, August 16, 2012, that Plaintiff's employment was terminated. The termination notice states the Plaintiff

was advised on August 2, 2012 that an audit of the Delaware payments was being conducted. Thus, it appears somewhat coincidental that the results of the audit were contemporaneous with the scheduling of the Plaintiff's surgery. The termination notice further provides the audit revealed that Plaintiff made a number of errors in processing payments. According to the termination notice from Jason Shrum and Melinda Lawson, the Plaintiff explained the errors by stating that the Delaware payment was often received late in the day on Friday when she was in a hurry to leave. The Plaintiff denies making the statement. Mr. Shrum testified it was not until the Plaintiff allegedly stated that she made the errors because she did not want to stay and work overtime that the decision was made to terminate her employment.

Accordingly, the Plaintiff was terminated the day after she notified her supervisor of the date of her surgery. Although this appears at first to be suspicious, the Court does not believe the timing to be probative of discriminatory intent, based on all of the facts in the record. In Cracco v. Vitran Exp., Inc., 559 F.3d 625 (7th Cir. 2009), the Seventh Circuit

determined that although the employee was terminated on the day he returned from FMLA leave, the timing of the termination was not sufficiently probative to establish a causal link when the problems with the employee's work performance were not discovered until the employee took leave. See id. at 633-34. Based on its investigation, the employer believed that the employee had been covering up shipment problems in the terminal and was the source of those problems. See id. at 634. "If the FMLA allows an employer to base adverse employment actions on performance problems discovered while the employee is on leave, the fact that the employer discharges the employee when he returns from leave cannot be sufficient evidence to establish causation." Id.

### (2)

Although Cracco is not entirely analogous to the facts here, the Court finds its reasoning to be instructive. The timing of the Plaintiff's termination seems less suspicious when it is remembered that the audit which led to the discovery of the Plaintiff's mistakes was ordered no later than August 2, 2012. In this case, the mistakes were revealed within one

day of the Plaintiff learning the date of her surgery.  If an employer can base an adverse employment decision on performance issues discovered while an employee is on leave, the Court is aware of no reason why the employer would be prohibited from basing such a decision on information discovered approximately one month before FMLA leave is scheduled to begin.

Although the Plaintiff denies making any intentional mistakes, the Court's focus under the direct method is on whether the Defendants believed the reasons asserted for the termination. See Cracco, 559 F.3d at 634 n.4 ("What is important for our analysis, however, is the fact that Vitran believed that the problems at the terminal were caused by Mr. Cracco disguising late and damaged deliveries.").  The Plaintiff's assertion that the termination document did not say she intentionally made errors is not accurate.[1]  The termination document stated: "Clara's response of not wanting to get the work done in a timely and accurate manner because she

---

[1] The Plaintiff is correct that the termination document does not state that her errors were "malicious."  Melinda Lawson testified she believed the errors to be "malicious" essentially because they were intentional—one would have "to think about making those changes" to balance the numbers.

wanted to leave is not acceptable. While this may not have been malicious, it was a repeated intentional act that has an adverse impact on the business." The important issue for the Court's analysis is that Defendants believed the Plaintiff's work included errors that were intentionally committed because she was in a hurry to leave the office on a Friday afternoon.[2] When this information is considered, the timing of the Plaintiff's termination appears much less suspicious.[3]

Based on the termination documentation from Jason Shrum and Melinda Lawson, it cannot reasonably be disputed that Defendants believed the Plaintiff intentionally committed errors in processing the payments. The termination documentation is corroborated by the testimony of Mr.

---

[2]In her Response to the Plaintiff's Motion for Summary Judgment, the Plaintiff states, "The notion that Plaintiff admitted to intentionally making errors only surfaced after Ms. Ushman filed her lawsuit." See Doc. No. 66, at 15. Based on the contents of the termination documentation, it is apparent that Defendants interpreted the Plaintiff's statements as an admission to intentionally making errors on the day they were made.

[3]As the Defendants allege, moreover, the timing is also not as suspicious based on the fact they were aware that Plaintiff had inquired about FMLA leave for a couple of months before she was told of her scheduled surgery date. Moreover, Jason Shrum was aware of her medical issues over the course of that period.

Shrum and Ms. Lawson. Accordingly, the Plaintiff's argument regarding suspicious timing does not contribute to a "convincing mosaic" of direct or circumstantial evidence to show the Defendants acted with discriminatory intent.

The Plaintiff also alleges that Justin Miller had a record of intentional misconduct at Horace Mann. Although the Plaintiff does not develop her argument, it appears that in June of 2010, Mr. Miller was issued a written reprimand and final warning for disconnecting callers. In June of 2011, Mr. Miller was advised that he had met the expectations which were outlined in the reprimand. Because the Plaintiff has not addressed how Mr. Miller's violations were similar to her own, the Court is unable to conclude that they were similarly situated employees. Accordingly, the fact that they did not receive the same discipline is insignificant.

According to Horace Mann's Employee Handbook, the altering or falsifying of company documents or client records could lead to immediate dismissal. Although the Plaintiff alleges that the termination documentation does not specify this as a violation, there can be little

question that Jason Shrum and Melinda Lawson believed the Plaintiff committed this violation based on the information she provided on August 16, 2012.

Based on the foregoing, the Plaintiff is unable to show that the proffered reason for the Plaintiff's termination was a pretext for an impermissible reason. It is not enough to show that the asserted reasons were mistaken; "to establish pretext a plaintiff must show that the employer is lying when it claims that the [proffered] justifications were the real reasons for the adverse employment action." Harper v. Fulton Cnty., Ill., 748 F.3d 761, 768 n.7 (7th Cir. 2014). Here, there is no evidence that Defendants were lying in specifying why the Plaintiff was terminated. The fact that Jason Shrum was aware for at least a couple of months that Plaintiff would be taking FMLA leave and she was not terminated until the Defendants received the results of the audit suggests that Defendants were not lying. The Plaintiff was terminated due to the errors discovered in the audit which were determined to be intentional.

Therefore, the Plaintiff is unable to establish a "convincing mosaic of

circumstantial evidence" from which the Court may infer a causal connection between the Plaintiff exercising her FMLA leave and her termination.

The Plaintiff proceeded only under the direct method of proof by presenting circumstantial evidence. Because the Plaintiff has not presented a prima facie case of FMLA retaliation, the Defendants are entitled to summary judgment.

C. Other claims

The Plaintiff is unable to assert a claim for FMLA interference. To allege a claim, the Plaintiff must establish five elements, two of which are (1) that she was entitled to take leave under the FMLA; and (2) her employer denied her FMLA benefits to which she was entitled. See Goelzer v. Sheboygan Cnty., 604 F.3d 987, 993 (7th Cir. 2010). Because the Plaintiff was no longer employed by Horace Mann at the time she planned to take leave, the Plaintiff cannot assert a claim for FMLA interference.

The Plaintiff has asserted a supplemental state law claim for retaliatory discharge under 820 ILCS 350/4(h). Because the federal claims

are being dismissed, the Court declines to exercise jurisdiction over the state law claim.  See 28 U.S.C. § 1367(c)(3); see also Sharp Electronics Corp. v. Metropolitan Life Ins. Co., 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks omitted).

<u>Ergo</u>, the Motion of Defendants Horace Mann Service Corporation, Jason Shrum and Melinda Lawson for Summary Judgment [d/e 52] is ALLOWED.

Counts I and II are Dismissed With Prejudice.  Count III is Dismissed Without Prejudice.

The Clerk will enter Judgment in favor of the Defendants.

ENTER: September 23, 2014

FOR THE COURT:

s/Richard Mills

Richard Mills
United States District Judge